**UNITED STATES DISTRICT COURT**

**SOUTHEN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEAD CREATION INC., | Case No. 1:22-cv-10377 |
| Plaintiff, | |
| | **Defendants' Notice Of Motion To Dissolve The Preliminary Injunction And Temporary Restraining Order And To Dismiss The First Amended Verified Complaint** |
| v. | |
| THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A", | |
| Defendants. | Judge Jesse Furman |

PLEASE TAKE NOTICE that, upon the accompanying memorandum of law, declaration including the accompanying exhibits attached thereto, and all prior pleadings and filings, Defendants Shenzhen Sen Zhi Run Dian Zi Shang Wu Co., Ltd. and Haikoushi Lvxuan Trading Co., Ltd. will move before the Honorable Jesse Furman, at Courtroom 1105 of the Thurgood Marshall United States Courthouse, 40 Centre Street, New York, NY 10007 on March 2, 2023 at 4:30 P.M. to terminate the default proceedings and for an Order pursuant to Fed. R. Civ. P. 60(b) dissolving both the Preliminary Injunction and the temporary restraining order ("TRO").

Defendants will further move before this Court on March 16, 2023 for an Order pursuant to Fed. R. Civ. P. 12(b)(6) dismissing the complaint herein in its entirety with prejudice and any other and further relief as the Court deems proper and just.

The undersigned was retained five days ago and has worked as hard as possible to prepare these papers and file them as soon as possible. Defendants respectfully request that the Court act

as soon as possible to address the matter of dissolution of the TRO and preliminary injunction given the very adverse impact the TRO and now the Preliminary Injunction has had and is having on Defendants–basically shutting down their businesses at no benefit for Plaintiff since Plaintiff is not a manufacturer or seller of products made using the technology in question. That technology was not the creation of the alleged Taiwanese inventors listed on the U.S. patent, as courts and patent offices in mainland China, Taiwan, Germany and Japan have determined as set out in Defendants' papers in support of this motion, but rather is derivative of patents extending back long before the application for the U.S. Patent-in-suit was filed. Hence the technology is neither novel nor nonobvious–as those foreign courts and patent offices have uniformly and repeatedly determined.

Dated: New York, NY
      March 1, 2023

Respectfully submitted,

/s/ *Beixiao Liu*
_____

Beixiao Robert Liu (Bar #: 5697552)

Balance Law Firm

1 World Trade Ctr Ste 8500
New York, NY 10007

(212) 741-8080

(646) 558-4889

robert.liu@balancelawfirm.com

Attorneys for Defendants Shenzhen Sen Zhi Run Dian Zi Shang Wu Co., Ltd. and Haikoushi Lvxuan Trading Co., Ltd.

TO:   Michael A. Hurckes Esq.
      MAH Advising LLC

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**SOUTHEN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEAD CREATION INC., | |
| Plaintiff, | Case No. 1:22-cv-10377 |
| v. | |
| THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A", | |
| Defendants. | Judge Jesse Furman |

**Memorandum Of Law In Support Of**
**Motion To Dissolve The Preliminary Injunction And The Temporary Restraining Order**
**And In Support Of Motion To Dismiss The First Amended Verified Complaint**

## TABLE OF CONTENTS

*Introduction* ................................................................................................... 5

*Statement of Facts* ....................................................................................... 7

*LEGAL ARGUMENTS* .................................................................................15

**I.    Foreign Patent Office Decisions And Foreign Court Judgments Shed Dispositive Light On This Action And Confirm How Baseless It Is.**................................................................15

**II.   The Patent-In-Suit Is Invalid For Obviousness Under 35 U.S.C. § 103.** ...............................17

**III.  Patent Is Invalid For Lack Of Candor And Good Faith In Dealing With The USPTO.** ....21

**IV.   The Preliminary Injunction and the TRO Should Be Vacated.**..........................................**22**

  A.   Plaintiff Has Failed To Demonstrate It Is Likely To Succeed on the Merits. ...........................23

  B.   The Plaintiff Has No Irreparable Harm...........................................................................24

  C.   The Balance Of Hardships Between The Plaintiff And Defendant .......................................25

  D.   This Action And The TRO And Preliminary Injunction Are Not In The Public Interest..................26

**CONCLUSION**...........................................................................................**26**

### TABLE OF AUTHORITIES

**Supreme Court Opinions**

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) ................................................................................ 8

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398, 127 S. Ct. 1727 (2007) ............................................. 7,8

*Winter v. NRDC, Inc.*,
    555 U.S. 7, 129 S. Ct. 365 (2008) ................................................... 10

**Federal Court Opinions**

*Altana Pharm. AG v. Teva Pharms. USA, Inc.*,
    566 F.3d 999 (Fed. Cir. 2009) .................................................... 10,11

*Apple Inc. v. Samsung Elecs. Co.*,
    695 F.3d 1370 (Fed. Cir. 2012) ...................................................... 12

*Belden Techs., Inc. v. Superior Essex Commc'ns LP*,
    802 F. Supp. 2d 555 (D. Del. 2011) ................................................ 10

*Caterpillar Tractor Co. v. Berco, S.P.A.*,
    714 F.2d 1110 (Fed. Cir. 1983) ........................................................ 6

*Demirayak v. City of N.Y.*,
    746 F. App'x 49 (2d Cir. 2018) ...................................................... 12

*Ga.-Pac. Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970) ................................................ 14

*Hangzhou Chic Intelligent Tech. Co. v. Gyroor*,
    2022 U.S. Dist. LEXIS 223212 (2022) ............................................ 14

*Joshi v. Trs. of Columbia Univ.*,
    No. 17-cv-4112 (JGK), 2020 WL 5125435 (S.D.N.Y. Aug. 31, 2020) .............. 13

*Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n*,
    965 F.2d 1224 (2d Cir. 1992) .......................................................... 10

*Moore v. Consol. Edison Co. of N.Y., Inc.*,
    409 F.3d 506 (2d Cir. 2005) ............................................................ 12

*N. Am. Soccer League, L.L.C. v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018) .............................................................. 10

*Oliver v. N.Y. State Police*,
    812 F. App'x 61 (2d Cir. 2020) ...................................................... 12

*Owens Corning v. Fast Felt Corp.*,
    873 F.3d 896 (Fed. Cir. 2017) .......................................................... 8

*Pexcor Mfg. Co. v. Uponor Ab*,
    920 F. Supp. 2d 151 (D.D.C. 2013) .................................................. 6

*Revision Mil., Inc. v. Balboa Mfg. Co.*,
    700 F.3d 524 (Fed. Cir. 2012) ........................................................ 11

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010) ............................................................. 12

*Tanabe Seiyaku Co. v. U.S. ITC,*
    109 F.3d 726 (Fed. Cir. 1997) ........................................................... 6

*trueEX, L.L.C. v. MarkitSERV Ltd.,*
    266 F. Supp. 3d 705 (S.D.N.Y. 2017) ............................................. 13

*We the Patriots USA, Inc. v. Hochul,*
    2021 U.S. App. LEXIS 32880 (2d Cir. Nov. 4, 2021) .................... 10

**United States Code**
35 U.S.C. § 103 ...................................................................................... 7,8

**State Law**
Section 1301(a) of the New York State Business Corporation Law ......................................... 5

Defendants Shenzhen Sen Zhi Run Dian Zi Shang Wu Co., Ltd. and Haikoushi Lvxuan Trading Co., Ltd. ("Defendants") have now retained counsel and hereby move the Court to dissolve the Temporary Restraining Order ("TRO") and Preliminary Injunction and to dismiss the First Verified Amended Complaint (the "Complaint") with prejudice for failure to state a claim for the compelling reasons listed below.

## INTRODUCTION

The evidence is clear that the very technology that plaintiff Lead Creation Inc. ("Plaintff") relies upon for this action, embodied in the Patent-in-suit that Plaintiff purchased from the claimed inventors, the Ouyangs, just a few months ago, has been determined both by courts (up to the highest level) and by patent offices in Taiwan, mainland China, Germany and Japan to be ineligible for patenting for obviousness. As a result, the foreign patents of this technology, identical in content to the Patent-in-suit, have been declared invalid and unenforceable in all four countries. All of this happened years before Plaintiff's action was filed. Moreover, after these adverse rulings in every country in which the Ouyang's patents have been challenged, the Ouyangs failed to make maintenance payments for the U.S. Patent-in-suit. Plaintiff, having paid the Ouyangs a mere $20,000 (in Chinese currency) for assignment of the U.S. patent, paid another $4,900 in petition and back maintenance fees to the USPTO claiming, as it had to in order to revive the U.S. Patent-in-suit, that the failure of payment by the Ouyangs was unintentional. That representation to the USPTO was plainly false. The Ouyangs had given up on their U.S. patent because they knew that it was indefensible, and Plaintiff's assertion to the contrary as to unintentionality was a fraud on the USPTO sufficient itself to cause the patent's reinstatement to be voided.

Plaintiff's papers filed with this Court disclose none of this information, nor was it disclosed to the USPTO. In short, plaintiff is a patent troll that prays on foreign defendants who lack experience with the U.S. courts. Plaintiff makes wild assertions in its Complaint of theft of U.S technology when the claimed inventors are Taiwanese–as the U.S. patent itself discloses on its first page–and when the foreign courts and patent offices that have addressed the same technology embodied in foreign patents have determined that the technology is in no respect non-obvious but is derivative on U.S. patents dating back to 1923. Thus, it is the Ouyangs who attempted to steal U.S. technology, and plaintiff stands in their shoes as their assignee.

Thus, plaintiff's claims fail for obviousness, for fraud on the USPTO in failure to disclose prior patent filings abroad more than a year before the U.S. patent filing–that on their face defeat U.S. patentability–and for gross patent misuse in bringing this litigation as well as in failures of disclosure to the USPTO.

Defendants respectfully request that their motion be heard on an expedited basis in light of the fact that the TRO has already caused irreparable harm to Defendants and the TRO and the newly issued Preliminary Injunction continue to do so every day by shutting down Defendants' sales and denying them the funds paid for prior sales. The Defendants are middlemen, not the manufacturer of the product in question; so they have payment obligations whether they are denied their income stream or not. By contrast, Plaintiff's injury--even if it were provable, as it cannot be for the reasons given above and elaborated upon below--is all quantifiable in monetary damages for royalties lost since Plaintiff has alleged no attempt to actually manufacture or sell any products in the U.S. using the alleged technology in the U.S. Patent-in-suit. Meanwhile, the TRO

and Preliminary Injunction have denied U.S. customers the opportunity to purchase a valuable and useful product as sold by the Defendants.

## STATEMENT OF FACTS

Plaintiff portraited itself as just another victim of a general pattern of Chinese piracy of U.S. intellectual property. (Complaint ¶¶3[1], 17[2]) However, this case is not about Chinese theft of the U.S. patented technology at all. The inventors of the Patent-in-suit, Chieh Ouyang and Wei Ouyang (the "Ouyangs"), are Taiwanese nationals and are citizens of the Republic of China, not citizens of the United States, and they have been residing and working in mainland China for the past 30 years. (Defs' Att'y Decl. ¶ 8) In 1994, the Ouyangs founded Great Electronics (Xiamen) Co, Ltd in the city of Xiamen, Fujian Province, in mainland China to manufacture lighting devices. (Defs' Att'y Decl. ¶ 9)

In the second half of 2006, the Ouyangs filed patent applications in five countries simultaneously on the same technology ("Technology")– LED fast zoom lighting device–that they allegedly invented: June 2 in mainland China, June 9 in Taiwan, August 25 in the U.S., September 15 in Japan, and December 14 in Germany. (Defs' Att'y Decl. ¶¶ 11, 17, 20, 22, 23)

These five patent applications all have only one independent claim–Claim 1, which reads remarkably identical despite written in four different languages, and it generally says the following:

> An LED quick-zoom lighting device, mainly comprising a body, a power supply unit and an LED; the power supply unit is placed in the body, the LED is arranged at the front end

---

[1] Stating: "…Defendants reside and/or operate in the People's Republic of China or other foreign jurisdictions with lax intellectual property enforcement system."

[2] Attaching the report "Combating Trafficking in Counterfeit and Pirated Goods–Report to the President of the United States", January 24, 2020

of the body, and the LED forms a power supply connection with the power supply unit through a circuit board, characterized in that: a convex lens that can move back and forth relative to the LED is arranged on the optical axis in front of the LED, and the distance between the LED and the convex lens varies within twice the focal length of the convex lens.
(Defs' Att'y Decl. ¶¶ 16, 24)

The Ouyangs filed the application with the USPTO for the Patent-in-suit on August 25, 2006. In their Declaration For Patent Application, the Ouyangs acknowledged the duty to disclose information which is material to patentability as defined in 37 CFR § 1.56, which imposes on patent applicants a duty of candor and good faith in dealing with the USPTO, and imposes the duty to disclose information continuously with respect to each pending claim. (Defs' Att'y Decl. ¶¶ 11–13)

In their application to the USPTO, the Ouyangs did not disclose that two months earlier, they had applied for patents for the same alleged invention in mainland China and Taiwan; nor did they list any U.S. patent documents as reference. They only listed only one foreign patent document–a mainland Chinese patent–as reference. (Defs' Att'y Decl. ¶¶ 13, 15)

Nor did the Ouyangs claim foreign priority date in their application to the USPTO. So the first conclusion drawn by Plaintiff's expert that "Lead Creation '706 Patent was…with…a foreign priority date for China of July 2004" is plainly wrong. (Defs' Att'y Decl. ¶ 14)

The five patents were all granted initially: November 30, 2006 in Japan ("Japanese Patent"), December 14, 2006 in Germany ("German Patent"), May 11, 2009 in Taiwan ("Taiwanese Patent"), May 12, 2009 in the U.S. ("Patent-in-suit"), and June 10, 2009 in China ("Chinese Patent"). (Defs' Att'y Decl. ¶¶ 17, 20, 22, and 23)

Once their patents were granted, the Ouyangs wasted no time to monetize their newly-granted patent by bringing lawsuits against manufacturers, retailers and merchants of flashlights, especially in mainland China and in Taiwan. (Defs' Att'y Decl. ¶¶ 32, 33, 49)

While the Ouyangs were litigating in court, their newly-granted patents began to be challenged in the patent office and courts of each jurisdiction, and the Ouyangs invariably losted all these legal battles both at the patent office of each country as well as in courts.

First, another manufacturer of lighting devices in mainland China filed an reexamination request on the Chinese Patent, and on June 2, 2010 ruled that the Chinese Patent is invalid for obviousness. In reaching its conclusion, the China Patent Office relied heavily on a U.S. patent granted in 2005 ("U.S. Patent 2005"). (Defs' Att'y Decl. ¶¶ 26–27) The China Patent Office compared each limitation of Claim 1 in the Chinese Patent with that of Claim 1 in the U.S. patent, and held that the only difference between the Chinese Patent and U.S. Patent 2005 is whether the distance between the lens and the LED can be between one time and twice the focal length of the lends, and such a difference lacks non-obviousness as required under the patent law. (Defs' Att'y Decl. ¶ 29)

The Ouyangs first appealed the Chinese Invalidation Decision to the Beijing Intermediate People's Court, which upheld the Chinese Invalidation Decision on December 20, 2010. The Ouyangs further appealed to the Beijing High People's Court, upheld the Chinese Invalidation Decision on October 17, 2011. (Defs' Att'y Decl. ¶¶ 30-31)

Consequently, the Ouyangs lost their other patent infringement lawsuits against manufacturers, retailers and merchants in mainland China, as the other courts relied on the ruling

by the Beijing High People's Court and reasoned that if the patent is invalid, then there is no infringement. (Defs' Att'y Decl. ¶ 32)

While they were fighting the patent invalidation decision and patent infringement cases in mainland, the Ouyangs were fighting the same legal battles in Taiwan, and arguably fought even harder than in mainland China.

In the few months after the Taiwanese Patent was granted, the Ouyangs started two patent infringement cases: 1) in the Lawsuit against Hweilung and On Light, the Ouyangs bought a flashlight from a retailer at a large shopping mall in Taipei, and sued the manufacturer Hweilung Company, the distributor On Light Company, and the shopping mall Test Rite Retail Co., Ltd; and 2) in the Lawsuit against Wang Da Dian and PC Home Online, the Ouyangs bought a flashlight from a online e-commerce platform PC Home Online, and sued both the online third-party seller Wang Da Dian and the e-commerce platform PC Home Online for patent infringement. (Defs' Att'y Decl. ¶¶ 33 and 39)

In the Lawsuit against Hweilung and On Light, based on evidence offered by defendant Hweilung Company and On Light Company, on May 31, 2010, the trial court–the Taiwan Intellectual Property Court–held that the Taiwanese Patent is invalid for obviousness, because all the limitations of the Taiwanese Patent had been fully disclosed by a combination of two U.S patents: a patent titled "Flash Light" with a patent number 1,478,282 ("U.S. Patent 1923"), granted on December 18, 1923, and another patent titled "FLASHLIGHT" US 7,147,343 B2 ("U.S. Patent 2006"), first published by the USPTO on September 30, 2004 and granted on December 12, 2006. (Defs' Att'y Decl. ¶ 34) After a meticulous limitation-by-limitation comparison analysis, the Taiwan Intellectual Property Court concluded that the only difference

between the Taiwanese Patent and the U.S. Patent 2006 is that the U.S. Patent 2006 did not set forth the distance between the lens and the LED in the range of zero to one time focal length, and the only two differences between the Taiwanese Patent and the U.S. Patent 1932 are the following: 1) the light source in the U.S. Patent 1923 is a light bulb, whereas the light source in the Taiwanese Patent is LED; 2) the U.S. Patent 1923 left the distance between the light source and the lens undefined, whereas the Taiwanese Patent defines a "first range" and a "second range." (Defs' Att'y Decl. ¶¶ 34–38) Such characterization of the differences between the Taiwanese Patent and the two U.S. Patents is acknowledged and agreed to by the Ouyangs during the court hearings in Taiwan. (Defs' Att'y Decl. ¶ 39) The Taiwanese Intellectual Property Court held that according to the principles of optical imaging, convergence of lighting beam requires a distance of one focal length and two focal lengths, whereas divergence of lighting beam requires 0 and one focal length. The boundary of such distances should be very familiar principles and common knowledge for people who are in the field of optics. Therefore, the Taiwanese Intellectual Property Court held that for a person skilled in the art, a combination of U.S. Patent 2006 and U.S. Patent 1923 did not produce unexpected effects, and therefore, the Taiwanese Patent could have easily been made by an ordinarily skilled person in the art based on prior art references U.S. Patent 2006 and U.S. Patent 1932. (Defs' Att'y Decl. ¶ 40)

After losing at the trial court level in May 2010, in the next three years from 2011 to 2014, the Ouyangs attempted to appeal and overturn the trial court decision relentlessly, but to no avail. The Ouyang appealed to or otherwise moved for reconsideration before the appellate division of the Taiwan Intellectual Property Court four times, causing the appellate division to warn them "not to engage in further frivolous litigation;" the Ouyangs even appealed the Supreme Court of

Taiwan–the court of last resort in Taiwan–four times, only to be dismissed every single time for failing to state a claim that the Supreme Court of Taiwan could grant a relief. (Defs' Att'y Decl. ¶¶ 41–48)

Similarly, for the Lawsuit against Wang Da Dian and PC Home Online, on August 30, 2010, the Taiwan Intellectual Property Court engaged in its own extensive analysis and independently drew the same conclusion: the Taiwanese Patent is invalid for lack of non-obviousness, because it could have been easily made by a person skilled in the art by combining U.S. Patent 1923 and U.S. Patent 2004. The Ouyangs appealed and on March 29, 2011, the appellate division affirmed the lower court decision. (Defs' Att'y Decl. ¶¶ 50–51)

During the course of the Lawsuit against Wang Da Dian and PC Home Online, on June 17, 2010, PC Home Online filed a request with the Taiwan Patent Office to invalidate the Taiwanese Patent. In response to this request, the Taiwan Patent Office initiated the invalidation review process, and during this process, on December 23, 2010, the Ouyangs made an application to amend the Taiwanese Patent. Their application to amend was granted. (Defs' Att'y Decl. ¶¶ 52–54)

On September 2, 2011, the Taiwan Patent Office ruled that the Taiwanese Patent, even after considering the amendment, is invalid for obviousness ("Taiwanese Invalidation Decision"), because it could have been easily made by a person ordinarily skilled in the art by combining U.S. Patent 1923 and U.S. Patent 2006. (Defs' Att'y Decl. ¶¶ 54–55)

The Ouyangs appealed the Taiwanese Invalidation Decision to court. After losing at both the trial court level and the appellate court level, they sued to the Supreme Administrative Court of Taiwan, which on November 21, 2013 upheld the ruling of the Taiwan Intellectual Property

Court and confirmed that the Taiwanese Patent is invalid for lack of nonobviousness, because it could have been easily made by a person skilled in the art by combining U.S. Patent 1923 and U.S. Patent 2006. (Defs' Att'y Decl. ¶¶ 56–57)

Incidentally, one week before PC Home Online filed a request with the Taiwan Patent Office for invalidating the Taiwanese Patent, the auto maker Infinity submitted a Request for Registrability Report to the Japan Patent Office on June 10, 2010, and demanded a technology assessment of the Japan Patent. (Defs' Att'y Decl. ¶ 58)

On November 29, 2011, the Commissioner of the Japan Patent Office issued a technical opinion ("Japanese Technical Opinion") on the Japanese Patent, ruling that the all the claims in the Japanese Patent lack the inventive step or non-obviousness. In particular, for Claim 1, the Japanese Technical Opinion stated that "it was very easy for a person ordinarily skilled in the art to conceive of placing the range of the micro adjustment of the Focal Point Distance f within 2 multiples." (Defs' Att'y Decl. ¶¶ 59-60)

Shortly after the dust completely settled for the Ouyangs with respect to their patents in Asia, their patent started to get challenged in Europe. On April 20, 2015, an IP right review request was filed with DPMA, requesting cancellation of the German Patent. On September 30, 2016, the IP right on the German Patent expired. The Ouyangs appealed through DPMA's administrative review process and on March 7, 2017, the DPMA affirmed the cessation of IP right on the German Patent ("German Invalidation Decision"). The Ouyangs then appealed the German Invalidation Decision to court, and on May 16, 2017, their case was pending before the Federal Patent Court of Germany ("BPatG"). On November 27, 2018, all of the Ouyang's appeals were rejected, refused or otherwise settled in Germany. (Defs' Att'y Decl. ¶¶ 61-65)

While the Ouyangs were fighting their legal battles on the validity of their patents in Asia and in Europe, they did remember to pay maintenance fees for their U.S. Patent-in-suit: the 3.5-year fee in 2012 and the 7.5-year fee in 2016. And yet, after losing the final appeal in Germany at the end of 2018, which marked their total defeat of their legal battles on their patents across Asian and Europe which lasted almost ten years–2009 to 2018–the Ouyangs did not pay the 11.5-year maintenance fee in the amount of $3,850 due in November 2020, resulting in their U.S. Patent-in-suit go expired in May 2021.  (Defs' Att'y Decl. ¶ 66)

While the Ouyangs have had the Patent-in-suit in the U.S. for more than a decade and Defendants have been selling flashlights on Amazon.com for years, the Ouyangs never took any legal action in the U.S. to enforce the Patent-in-suit in the U.S. prior to this lawsuit, and even had let the Patent-in-suit expire in 2021 for nonpayment to the USPTO of a $3,850 maintenance fee. (Defs' Att'y Decl. ¶¶ 66-67)

One and a half years after the expiration of the Patent-in-suit, on October 31, 2022, the Ouyangs assigned the Patent-in-suit to Plaintiff for a nominal price of $20,000, paid to the Ouyangs in Chinese currency.  (Defs' Att'y Decl. ¶ 10)

On November 3, 2022, Plaintiff's attorney Michael Alexander Hurckes, acting on behalf of Plaintiff, filed a Petition to Accept Unintentionally Delayed Payment of Maintenance Fee In An Expired Patent. This Petition was dismissed by the USPTO on November 15, 2022, because it was "considered to not contain a proper statement of unintentional delay." After the Plaintiff's resubmission of the Petition through a different patent practitioner in Texas, the USPTO granted the petition on December 7, 2022, but noted the following:

"It is not apparent whether the person signing the statement of unintentional delay was in a position to have firsthand or direct knowledge of the facts and circumstances of the delay at issue. Nevertheless, such statement is being treated as having been made as the result of a reasonable inquiry into the facts and circumstances of such delay…. **In the event that such an inquiry has not been made, petitioner must make such an inquiry.** If such inquiry results in the discovery that it is not correct that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to 37 CFR 1.378 was unintentional, **petitioner must notify the Office**." **(Emphasis added.)**

On December 8, 2022, Plaintiff, on only the second full day of its ownership of the Patent-in-suit, filed this lawsuit claiming that Defendants' online sales of flashlights infringe Patent-in-suit and are causing irreparable harm to Plaintiff. However, Plaintiff has made no attempt to allege that it either manufactures or sells flashlights in the U.S. or anywhere else. What's certain is that Plaintiff was incorporated very recently– in Delaware on April 21, 2022–and although it claims to have its principal place of business in New York, it does not have the authority to transact business in New York–a violation of Section 1301(a) of the Business Corporation Law of the State of New York[3]. Plaintiff's attorney in this action is a director of plaintiff. (Verification to Complaint).

## LEGAL ARGUMENTS

### I.      Foreign Patent Office Decisions And Foreign Court Judgments Shed Dispositive Light On This Action And Confirm How Baseless It Is.

While U.S. courts generally do not give preclusive effect to foreign judicial decisions, the Federal Circuit Court has ruled that in evaluating patent infringement, "representations to foreign patent offices should be considered . . . when [they] comprise relevant evidence." *Tanabe*

---

[3] § 1301. Authorization of foreign corporations.(a) A foreign corporation shall not do business in this state until it has been authorized to do so as provided in this article.

*Seiyaku Co. v. U.S. ITC*, 109 F.3d 726 (Fed. Cir. 1997); *see Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110 (Fed. Cir. 1983) ("Though no authority is cited for the proposition that instructions to foreign counsel and a representation to foreign patent offices should be considered…there is ample such authority in decisions of other courts and when such matters comprise relevant evidence they must be considered.)

More recently, in *Pexcor Mfg. Co. v. Uponor Ab*, 920 F. Supp. 2d 151 (D.D.C. 2013), the District Court for the District of Columbia granted a stay of a patent invalidity declaratory judgment action brought by a Canadian corporation, pending the resolution of a case in Canada over the counterpart Canadian patents. The DC District Court pointed out that even though Canadian patent law is different from United States patent law, "a decision in Canada about the parties' rights under a 'nearly identical' patent likely will narrow the issues and possibly will resolve this case." The court then reasoned that it had discretionary authority to stay the United States case pending a decision in the Canadian litigation. Thus, in an attempt to avoid a complex, time-consuming, and costly litigation, the court granted the stay of the U.S. action.

Here, the foreign patent offices' decisions and foreign court judgments on the Ouyangs' patents–foreign counterparts of the Patent-in-suit–are relevant because the facts and circumstances surrounding their applications were substantially identical. In short, the patents as filed in each of the countries where the Ouyangs filed, including the U.S., claim the same technology. Moreover, the application for the Patent-in-suit was filed at or around the same time as its foreign counterparts. Specifically, the Patent-in-suit application was filed with the USPTO on August 25, 2006, and its foreign counterparts were filed in mainland China on June 2, 2006, in

Taiwan on June 9, 2006, in Japan on September 15, 2006, and in Germany on December 14, 2006.

Second, the claims of these patents are essentially the same. The Patent-in-suit has one independent claim–Claim 1–and eight dependent claims, and each of its foreign counterparts has one independent claim. And this sole independent claim for the Patent-in-suit and its four foreign counterparts is essentially the same.

The written description of the Patent-in-suit and their foreign counterparts are essentially the same, including the drawings attached and the testing data included.

Thus, it is entirely appropriate for this Court to give weight to these foreign patent office decisions and judicial judgments from Germany, Japan, Taiwan and mainland China in this case.

## II.     The Patent-In-Suit Is Invalid For Obviousness Under 35 U.S.C. § 103.

The Leahy-Smith America Invents Act of 2011 ("AIA") substantially amended the Patent Act and changed the definition of prior art for patents. The Patent-in-suit was granted in 2009, so it would be governed under the pre-AIA law. Under the pre-AIA law (35 U.S.C. § 103), a patent is invalid for obviousness if, in view of the prior art, the claimed invention would have been obvious to a person having ordinary skill in the art at the time of the invention.

In 2007, the U.S. Supreme Court's decision in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727 (2007) changed how obviousness is decided in view of prior art. In the many years leading up to 2007, the Federal Circuit followed the "teaching-suggestion-motivation" ("TSM") test. The TSM test is one in which inventions are only obvious if there is a teaching, suggestion, or motivation to modify or combine the prior art teachings to achieve the claimed invention. However, according to the Supreme Court in *KSR Int'l Co.*:

"[The rigid application of the "TSM" test for obviousness, is] "incompatible with our precedents. The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents . . . There is no necessary inconsistency between the idea underlying the TSM test and the *Graham* analysis. But when a court transforms the general principle into a rigid rule that limits the obviousness inquiry, as the Court of Appeals did here, it errs." *Id.* at 419, 127 S. Ct. 1727

"When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under 35 U.S.C.S. § 103." *KSR Int'l Co.*, 550 U.S. at 421, 127 S. Ct. 1727.

An obviousness inquiry involves the following considerations: (1) the level of ordinary skill in the pertinent art, (2) the scope and content of the prior art, (3) the differences between the prior art and the claims at issue, and (4) secondary considerations of non-obviousness such as commercial success, long-felt but unsolved needs, and failure of others. *See KSR Int'l Co.*, 550 U.S. 398, 127 S. Ct. 1727; *Graham v. John Deere Co.*, 383 U.S. 1 (1966).

For improvement based on combining prior art, the Supreme Court further held in *KSR Int'l Co.* that:

"When a work is available in one field, design incentives and other market forces can prompt variations of it, either in the same field or in another. If a person of ordinary skill in the art can implement a predictable variation, and would see the benefit of doing so, § 103 likely bars its patentability.

"A court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions.

"To determine whether there was an apparent reason to combine the known elements in the way a patent claims, it will often be necessary to look to interrelated teachings of multiple patents; to the effects of demands known to the design community or present in the marketplace; and to the background knowledge possessed by a person having ordinary skill in the art. To facilitate review, this analysis should be made explicit. But it need not seek out precise teachings directed to the challenged claim's specific subject matter, for a

court can consider the inferences and creative steps a person of ordinary skill in the art would employ." *KSR Int'l Co.*, 550 U.S. at 405, 127 S. Ct. 1727

"The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Owens Corning v. Fast Felt Corp.*, 873 F.3d 896, 902 (Fed. Cir. 2017) (reversing PTAB's finding of non-obviousness on patent for printing nail tabs on building cover material) (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007)).

Here, the prior art reference of U.S. Patent 2005, Exhibit K to Defendants' Att'y Declaration, discloses nearly all the limitations of Claim 1 of the Patent-in-suit as follows:

- the LED in U.S. Patent 2005 corresponds to the LED in Claim 1 of the China Patent;

- the first sleeve 42 in U.S. Patent 2005 corresponds to the body in Claim 1 of the China Patent;

- in U.S. Patent 2005, a plurality of lenses 38, which are Fresnel lens, are arranged in correspondence with the LED's, with each LED lying on the optical axis of an associated lens 38, it will be appreciated that zoom apparatus of the lamp effectuates beaM width adjustment through relative motion of the sleeves; because Fresnel lens have the same functionality as convex lens as to convergence of light, the lenses 38 in U.S. Patent 2005 matches the convex lens in Claim 1 of the China Patent;

- The associated battery or other electrical power Supply corresponds to the power supply in Claim 1 of the China Patent;

- In U.S. Patent 2005, LED is fixed at the front end of inner sleeve 42, which is same as that in Claim 1 of the China Patent;

- In U.S. Patent 2005, electrical components such as a printed circuit board that electrically connects the LED's and has optional driving electronics operatively arranged thereupon

an associated battery or other electrical power supply, is the same as that in Claim 1 of the China Patent.

During the administrative review of the Chinese Invalidation Decision, the Ouyangs agreed and acknowledged that all the limitations of Claim 1 of their China Patent are essentially disclosed by U.S. Patent 2005, with the only difference being the distance between the convex lens and the LED: the China Patent defines such a distance to be in the range of zero to twice the focal length of the convex lens, whereas the U.S. Patent 2005 left such a distance undefined. The Chinese court held that "it is a common knowledge in the field that the change in object distance between the convex lens and the light source changes the convergence of the beam", and "a skilled person in the field is motivated to use this above common knowledge of this range of 0 to 2 times the focal length of the object distance adjustment and apply it to the technical solution disclosed in Comparison Document 1, so as to obtain the technical solution claimed to be protected by Claim 1 of the China Patent…the above combination does not require any creative labor, and at the same time, the technical effect obtained is the same as the technical effect that can be obtained by the technical solution claimed to be protected by the China Patent." The China Invalidation Decision concluded that Claim 1 of the China Patent is not inventive. Such a decision has been upheld by both Beijing Intermediate People's Court and the Beijing High Court.

Similarly, in Taiwan, both the Taiwanese courts and the Taiwan Patent Office ruled that the Taiwanese Patent is invalid for lack of non-obviousness, because it could have been easily made by a person skilled in the art by combining U.S. Patent 1923 and U.S. Patent 2006.

### III.     Patent Is Invalid For Lack Of Candor And Good Faith In Dealing With The USPTO.

37 CFR § 1.56 provides, among other things, the following:

 "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section.

The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned.

[N]o patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct."

Here, the Ouyangs' conduct both during the application stage and more recently in their attempt to revive the expired patent raises serious questions about the Ouyangs' candor and good faith in dealing with the USPTO. As noted earlier, the Ouyangs failed to disclose to the USPTO the other four foreign patent applications filed at or around the same time as the U.S. Patent-in-suit, even though 37 CFR § 1.56 does impose such a continuous disclosure requirement on the Ouyangs to do so. The Ouyangs did not list any U.S. patent documents as references in their application, and that raises another serious question demanding answer from the Ouyangs, given that foreign courts have consistently held that a number of U.S. patents, including one dating back to 1923, are prior art references.

More recently, the Ouyangs and Plaintiff, as well as Plaintiff's counsel, represented to the USPTO that the nonpayment of maintenance fees was unintentional. However, despite the USPTO granted the petition to revive the Patent-in-suit, it stated quite bluntly that the USPTO is unsure if the Ouyangs' nonpayment was truly unintentional, and if the Plaintiff and/or its counsel has tried to find out the facts and circumstances around the Ouyangs' nonpayment.

## IV.     The Preliminary Injunction and the TRO Should Be Vacated.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365 (2008); *see We the Patriots USA, Inc. v. Hochul*, 2021 U.S. App. LEXIS 32880, at *22 (2d Cir. Nov. 4, 2021); *N. Am. Soccer League, L.L.C. v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

"A strong showing on one factor can compensate for a weak showing on another factor, but a patent owner must demonstrate **both** a likelihood of success and irreparable harm to be entitled to a preliminary injunction." *Altana Pharm. AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005–06 (Fed. Cir. 2009) (citations and internal quotation marks omitted) (emphasis added) (affirming the denial of a motion for preliminary injunction).

To determine whether to issue a TRO, the courts in the Second Circuit apply the same four-factor analysis used to evaluate a motion for preliminary injunction. *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n*, 965 F.2d 1224, 1228 (2d Cir. 1992).

An injunction may be more likely where the patent owner practices the invention, the parties are direct market competitors, the patented technology is at the core of the patent owner's business, and/or the market for the patented technology is volatile or still developing. See, e.g., Belden Techs., Inc. v. Superior Essex Commc'ns LP, 802 F. Supp. 2d 555 (D. Del. 2011).

Plaintiff can show none of the above, and its papers so reflect.

A.   Plaintiff Has Failed To Demonstrate It Is Likely To Succeed on the Merits.

The "estimated likelihood of success in establishing infringement is governed by Federal

Circuit law." *Revision Mil., Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012). The Federal

Circuit Court has held that

> "A patent holder seeking a preliminary injunction bears the ultimate burden of
> establishing a likelihood of success on the merits with respect to the patent's validity. If
> the alleged infringer raises a substantial question of invalidity, the preliminary injunction
> should not issue. **The burden on the accused infringer to show a substantial question**
> **of invalidity at this stage is lower than what is required to prove invalidity at trial.**
> **Vulnerability is the issue at the preliminary injunction stage, while validity is the**
> **issue at trial.** Once the accused infringer satisfies this requirement, the burden shifts to
> the patentee to show that the defense lacks substantial merit.
> *Altana Pharm. AG*, 566 F.3d at 1005–06 (citations and internal quotation marks omitted)
> (emphasis added) (affirming the denial of a motion for preliminary injunction).

Here, Plaintiff not only has no reasonable likelihood of success on the merits but ALSO

HAS every reasonable probability of failure on the merits: no proof of infringement of a

patentable technology and evidence of fraud by omission on the USPTO (failure to disclose so

much prior art and to disclose losses in foreign courts and patent offices) and commission

(asserting unintentionality to the USPTO when Plaintiff knew full well on information and belief

and definitely should reasonably have known with any degree of due diligence that the alleged

inventors intentionally failed to make the required maintenance payments and hence knowingly

abandoned their U.S. Patent). Moreover, patent misuse is present here on Plaintiff's part in

pursing what it should have known was a frivolous claim of infringement of the Patent-in-suit and

utterly baseless claims of theft of U.S. technology.

In short, the foreign counterparts of Patent-in-suit have been invalidated by patent offices

and courts in four major industrialized economies. Even when viewed individually and certainly

when viewed together they unquestionably and at a minimum raise a substantial question of

patent invalidity. In fact, defendants respectfully urge that the evidence of obviousness is so strong here that dismissal of this action is absolutely appropriate.

### B. The Plaintiff Has No Irreparable Harm.

Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. *Demirayak v. City of N.Y.*, 746 F. App'x 49, 51 (2d Cir. 2018).

To show irreparable harm, the movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages. Irreparable harm exists where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied. *Oliver v. N.Y. State Police*, 812 F. App'x 61, 62 (2d Cir. 2020).

The relevant harm is the harm that: (a) occurs to the parties' legal interests; and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction. *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010).

Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances. *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005).

There must also be a "clear showing" of irreparable harm—in particular, a "sufficiently strong causal nexus" between the alleged infringement and the alleged irreparable harm. *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1372 (Fed. Cir. 2012) (Apple II). For instance, if consumers would buy the accused product for reasons other than the patented feature, there could be no irreparable harm based on lost profits. In other words, the patented feature must drive consumer demand for the accused product. *Id.* at 1375. The irreparable harm standard can be

very difficult to meet, especially for component patents where the accused product contains many features in addition to the patented feature.

Here, there is absolutely no basis to justify Plaintiff's assertion that it will suffer irreparable harm absent a Preliminary Injunction or TRO. Plaintiff failed to allege that it either manufactures, sells, or otherwise operates in the flashlight industry in any capacity. Therefore, whatever injury it could possibly prove is entirely measurable, and compensable, in money damages.

### C.   The Balance Of Hardships Between The Plaintiff And Defendant

When weighing the equities involved on a motion for preliminary injunction, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. To establish that the balance of hardships tips in his favor, the plaintiff must demonstrate that the harm he would suffer absent the relief sought is substantially greater than the harm the defendants would suffer if the injunction were granted. *Joshi v. Trs. of Columbia Univ.*, No. 17-cv-4112 (JGK), 2020 WL 5125435, at *23 (S.D.N.Y. Aug. 31, 2020).

When balancing the hardships, the issue is whether the movants would suffer decidedly greater harm from an erroneous denial of an injunction than the defendants would suffer from an erroneous grant. *trueEX, L.L.C. v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 725 (S.D.N.Y. 2017)

Here, the hardship to defendants is severe and extends to lost sales of unknown magnitude. The irony in that is, of course, that those lost sales also represent lost royalties to Plaintiff if it were to prevail in this action since plaintiff has no sales itself or, on information and

belief, the capacity for making any sales. Therefore, the TRO and Preliminary Injunction are in neither the best interests of Plaintiff nor of Defendants.

The damages that would be available to plaintiff if it were to prevail constitute its measure of royalties. The most common method for determining a reasonable royalty is the hypothetical negotiation approach, that is, the royalty that a willing licensee (*i.e.*, the accused infringer) would agree to pay a willing licensor (*i.e.*, the patent owner) in a hypothetical arm's-length negotiation prior to the infsringement. It is typically calculated based on the non-exhaustive list of factors set out in *Ga.-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

        D.     This Action And The TRO And Preliminary Injunction Are Not In The Public Interest.

This lawsuit bears all the hallmarks of patent trolling in its worst form.

Plaintiff acquired the Patent-in-suit for the sole purpose of filing this lawsuit and holding it over the heads of defendants to induce them to pay plaintiff to go away. Plaintiff has no manufacturing capability, as previously noted, yet the TRO and Preliminary Injunction that Plaintiff has sought and obtained has had the effect of denying U.S. consumers access to a product they want.

## CONCLUSION

The failed patent proceedings abroad for Plaintiff's assignors, the Ouyangs, show not only the obviousness of the alleged invention embodied in the Patent-in-suit but also show the degree of Plaintiff's bad faith in bringing this action. If the technology were as revolutionary as Plaintiff claims in the complaint, why were the Ouyangs, who had fought suits around the world over their claimed technology and lost them all, willing to hand over the Patent-in-suit for $20,000? Surely that alone put plaintiff on notice to do due diligence here. In any event, the information on the

foreign suits and patent actions involving the Ouyangs is not difficult to locate for any attorney. How much more should an attorney who is also a Director of Plaintiff have done by way of due diligence? And if the due diligence was done and all this dismissal record on lack of non-obviousness unearthed by Plaintiff, how could it justify acting in good faith in bringing this action with requests for TRO and preliminary injunctive relief?  This action bears all the hallmarks of a patent trolling action at its worst. The Court should not let this reckless and abusive use of the judicial process continue to disrupt the legitimate flow of commerce.

The undersigned was retained five days ago and has worked as hard as possible to get these papers filed as soon as possible. Defendants respectfully request that the Court make the briefing time on this motion as short as possible given the very adverse impact the TRO and now the Preliminary Injunction has had on Defendants–basically shutting down their businesses. Defednants request that the Court immediately dissolve the TRO and Preliminary Injunction except to the extent of freezing $2,000 per defendant ($10,000 in total for five defendants) and allowing Defendants to resume sales pending the Court's final decision on the motions as they relate to the TRO and the Preliminary Injunction. Plaintiff is not selling any product using the technology in question (or any product at all, as far as Defendants can tell); so additional sales by Defendants only serve to increase Plaintiff's recovery in money damages if it should prevail. $10,000 is more than sufficient to cover those likely damages. However, in fact as these motion papers make clear, Plaintiff's likelihood of success on the merits, we respectfully submit, is exceedingly low.

As noted above, all the material presented by Defendants in these motion papers should have been obtained by Plaintiff in its due diligence before bringing this suit. So Plaintiff should

already be very familiar with this material and should need no lengthy extension of time to address it in responsive papers. However, if Plaintiff is not familiar with it, that provides further evidence of the lack of merit to Plaintiff's action and further grounds for dissolution of the TRO and Preliminary Injunction and dismissal of this action.

Dated: New York, NY
        March 1, 2023

Respectfully submitted,

/s/ *Beixiao Liu*

Beixiao Robert Liu (Bar #: 5697552)

Balance Law Firm

1 World Trade Ctr Ste 8500
New York, NY 10007

(212) 741-8080

(646) 558-4889

robert.liu@balancelawfirm.com

Attorneys for Defendants Shenzhen Sen Zhi Run Dian Zi Shang Wu Co., Ltd. and Haikoushi Lvxuan Trading Co., Ltd.