**UNITED STATES DISTRICT COURT**

**SOUTHEN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEAD CREATION INC., | Case No. 1:22-cv-10377-JMF |
| Plaintiff, | |
| v. | Honorable Jesse Furman |
| THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A", | |
| Defendants. | |

**Declaration Of Beixiao Robert Liu, Esq.**
**In Support Of**
**Motion To Dissolve The Preliminary Injunction And The Temporary Restraining Order**
**And In Support Of**
**Motion To Dismiss The First Amended Verified Complaint**

1

I, Beixiao Robert Liu, of full age, hereby declare as follows:

1.      I am a member of the Bar of this Court and am a member of Balance Law Firm, attorneys for defendants Shenzhen Sen Zhi Run Dian Zi Shang Wu Co., Ltd. and Haikoushi Lvxuan Trading Co., Ltd. ("Defendants") in the above-entitled action**.** I am familiar with the facts and circumstances in this action.

2.       I make this declaration pursuant to 28 U.S.C. § 1746 and Local Civil Rule 1.9 for the Southern District of New York, in support of Defendants' motion to dissolve the preliminary injunction order dated February 23, 2023 ("Preliminary Injunction") and the Temporary Restraining Order dated January 26, 2023 ("TRO"), and further to dismiss the First Amended Verified Complaint ("Complaint") filed by plaintiff Lead Creation Inc. ("Plaintiff"), by and through its counsel Michael Alexander Hurckes of MAH Advising PLLC, in its entirety and with prejudice.

**The Preamble**

3.      I was retained by Defendants on February 24, 2023 and set about immediately to review the record of the alleged inventors' attempts to have patents identical to the U.S. Patent no. 7,530,706 ("Patent-in-suit") embodying the same allegedly novel technology (the "Technology") upheld as lawful in the four jurisdictions other than the U.S. in which they have made patent filings: in

mainland China (where the alleged inventors did, and on information and belief continue to do, business), in Taiwan (where they were citizens and residents at the time of the Patent-in-suit issuance as stated on the Patent-in-suit itself), in Germany and in Japan. In each of these four jurisdictions, the Technology was found to be obvious by the respective jurisdiction's patent office and in full litigation through the appellate level in the courts of Taiwan, Germany and mainland China, all as laid out in detail below. In all four jurisdictions, the patents were therefore invalidated. Those courts in fact cited U.S. patents dating back as far as the 1920s as embodying the Technology. After losing all their legal battles in these four foreign jurisdictions, the alleged inventors stopped paying maintenance fees on their Patent-in-suit in the U.S., too, causing the Patent-in-suit to expire in 2021. Then more than a year later, in late 2022, the alleged inventors assigned the Patent-in-suit to Plaintiff for a nominal amount of $20,000 and in their petition to revive the expired Patent-in-suit, represented to the USPTO that the nonpayment of maintenance fees was unintentional, a statement that the USPTO found unconvincing. None of this information or the court and patent office determinations concerning those prior patents are referenced in the Complaint or in any of the papers filed in this action by which Plaintiff sought to convince the Court that a TRO and then a Preliminary Injunction should be imposed on

Defendants, shutting down their business in the U.S. Moreover, the Technology was allegedly created by the alleged inventors and first (ultimately unsuccessfully) patented outside the U.S. and is thus in no respect stolen U.S. technology as Plaintiff has adamantly asserted before the Court with voluminous materials on theft of U.S. technology appended to and incorporated within the Complaint. Defendants respectfully submit that these omissions and assertions constitute a flagrant abuse of process and amount to a fraud on the Court given how significant and indeed telling the omissions especially are. Those omissions are laid out in detail in the remainder of this Declaration.

### The Plaintiff and Its Counsel

4.      Plaintiff asserts that it is "a corporation specializing in the creation and sale of consumer products," (Pl.'s Br. in support of TRO 5 ¶1, ECF[5]) but was only incorporated on April 21, 2022, and other than this one-liner assertion by Plaintiff to describe its business, there is no allegation or evidence offered in the Complaint or any other pleadings and papers Plaintiff filed with the Court on what consumer products Plaintiff creates, manufactures and/or sells. Annexed as Exhibit A is a true and correct copy of the screenshot of the State of Delaware Department of State webpage showing the entity details for Plaintiff.

5.     Plaintiff claims to have its principal place of business in New York, (Complaint ¶2), and yet Plaintiff does not have the authority to conduct business in the State of New York as a foreign corporation. A true and correct copy of the search result for corporations in the State of New York using "lead creation" as keywords is annexed hereto as Exhibit B.

6.     In the Verification at the end of the Complaint, the Director of Plaintiff, Michael A. Hurckes, verified the truthfulness and accuracy of the Complaint. (Compl. 16) The Director of Plaintiff Michael A. Hurckes has exactly the same name as Plaintiff's counsel, Michael A. Hurckes, Esq. and may be the same person.

**The Patent-in-suit**

7.     The Patent-in-suit was assigned to Plaintiff on December 7, 2022, one day before the Complaint in this case was filed on December 8, 2022. Plaintiff's counsel Michael A. Hurckes had submitted the Patent Assignment Cover Sheet together with the Patent Acquisition Agreement and the Patent Assignment Agreement to the USPTO in November 2022 for approval and recordation. Annexed as Exhibit C is a true and correct copy of the Patent Acquisition Agreement and the Patent Assignment Agreement submitted by the Plaintiff's counsel.

8.      The inventors of the Patent-in-suit and also the assignors of the Patent-in-suit to Plaintiff, Chieh Ouyang a/k/a Xie Ouyang and Wei Ouyang (the "Ouyangs"), are Taiwanese nationals, and on information and belief, not U.S. citizens, and they have been living and doing business in mainland China for many years. Annexed as Exhibit D is a true and correct copy of the Ouyangs' declaration to the USPTO regarding their residence and citizenship.

9.      Upon information and belief, the Ouyangs are the founders and key executives of Great Electronics (Xiamen) Co Ltd, a company founded in 1994 and located in the city of Xiamen, Fujian Province, People's Republic of China; Great Electronics is a manufacturer of light devices in mainland China.

10.     The Patent-in-suit was assigned by the patentees, who are also the investors, to Plaintiff for 145,000 Chinese Yuan, the equivalent of $20,000 USD. The price is denominated in Chinese currency, suggesting that the payment for the Patent transfer was made in Chinese currency, as opposed to U.S. dollars or the Taiwanese currency, further suggesting that the original patentees, the Ouyangs, currently work and live in China. (Ex. C 3)

11.     The Ouyangs filed the application with the USPTO for the Patent-in-suit on August 25, 2006. In their Declaration For Patent Application, the Ouyangs

acknowledged the duty to disclose information which is material to patentability as

defined in 37 CFR § 1.56. (Ex. D)

12.     37 CFR § 1.56 provides, among other things, the following:

 "Each individual associated with the filing and prosecution of a patent
application has a duty of candor and good faith in dealing with the Office, which
includes a duty to disclose to the Office all information known to that individual to
be material to patentability as defined in this section.

The duty to disclose information exists with respect to each pending claim
until the claim is cancelled or withdrawn from consideration, or the application
becomes abandoned.

[N]o patent will be granted on an application in connection with which fraud
on the Office was practiced or attempted or the duty of disclosure was violated
through bad faith or intentional misconduct."

13.     In their application to the USPTO, the Ouyangs did not disclose that

two months earlier, they had applied for patents for the same alleged invention in

mainland China and Taiwan. (Ex. D)

14.     Nor did the Ouyangs claim foreign priority date in their application to

the USPTO. So the first conclusion drawn by Plaintiff's expert that "Lead

Creation '706 Patent was…with…a foreign priority date for China of July 2004" is

plainly wrong. (Pl. Expert Report 3 ¶ III-1; ECF [18-8])

15.     In Ouyangs' application for the Patent-in-suit in 2006, they did not list

any U.S. patent documents as reference, and listed only one foreign patent

document–a mainland Chinese patent–as reference. Annexed as Exhibit E is a true

and correct copy of the Ouyangs' Information Disclosure Statement submitted to the USPTO.

16.      The sole independent claim in Ouyangs' application for Patent-in-suit submitted to the USPTO in 2006 is the following:

> 1. A light-emitting diode (LED) lighting apparatus, comprising: a housing,  having a power source; a light-emitting diode, electrically connected with the power source and positioned at front end of the housing; and a convex lens, moved back and forth with respect to the light-emitting diode and distance between the LED and the convex within two times of focal length of convex lens.
>
> Annexed as Exhibit F is a true and correct copy of the Claims for the Patent-in-suit submitted in 2006.

## The Ouyangs' Foreign Patents

17.      The Ouyangs applied for a Chinese patent ("Chinese Patent") on the alleged Invention on June 2, 2006. The Chinese Patent was granted on June 10, 2009. The prior art considered by the Chinese patent examiner include the following patents from the U.S., Japan and China: US2004/0190286A1, granted on September 30, 2004; US 2004/0130892A1, granted on July 8, 2004; JP2002–289015A, granted on October 4, 2002; CN2740879Y, granted on November 16, 2005. Annexed as Exhibit G is a true and correct copy of the Chinese Patent granted and its English translation, and the earlier published patent application and its English translation.

18.     37 CFR § 1.56 provides, among other things, that

"The Office encourages applicants to carefully examine:
(1) prior art cited in search reports of a foreign patent office in a counterpart application, and
(2) The closest information over which individuals associated with the #ling or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office."

19.     In the Information Disclosure Statement submitted by the Ouyangs to the USPTO, (Ex. E) the Ouyangs did not list any U.S. patents, and listed only one foreign patent document, which is a patent from China. In other words, the Ouyangs did not disclose to the USPTO the prior art considered by the Chinese patent office as they should have.

20.     The Ouyangs applied for a patent on the alleged Invention with the Taiwan Patent Office on June 9, 2006, and the patent ("Taiwanese Patent") was granted on May 11, 2009. Annexed as Exhibit H is a true and correct copy of the Taiwanese Patent granted, the published patent specification and its English translation.

21.     The prior art considered by the Taiwan Patent Office were five patents from the U.S., mainland China and Taiwan, (Ex. H) but Ouyang did not disclose these prior arts to the USPTO except for one.

22.     The Ouyangs applied for a patent on the alleged Invention with the

Japan Patent Office on September 15, 2006, and the patent was issued a Certificate

of Utility Model # 3127330 ("Japanese Patent"). Annexed as Exhibit I is a true and

correct copy of the Japanese Patent granted and its English translation.

23.     The Ouyangs applied for a patent on the alleged Invention with the

German Patent and Trade Mark Office ("DPMA") on September 21, 2006, and

the patent was published on December 14, 2006 as utility model

DE202006014503U1. Annexed as Exhibit J is a true and correct copy of the

German Patent granted and its English translation.

24.     All these four foreign patents have only one independent claim as

follows:

a.   Claim 1 of the Chinese Patent: (Ex. G)

An LED quick-zoom lighting device, mainly comprising a body, a
power supply unit and an LED; the power supply unit is placed in the
body, the LED is arranged at the front end of the body, and the LED
forms a power supply connection with the power supply unit through
a circuit board, characterized in that: a convex lens that can move back
and forth relative to the LED is arranged on the optical axis in front of
the LED, and the distance between the LED and the convex lens
varies within twice the focal length of the convex lens.

b.   Claim 1 of the Taiwanese Patent: (Ex. H)

A fast zooming device for LEDs, comprising: a main body, a power
supply unit is installed inside the main body; an LED, the LED is

connected to the power supply unit, so that the LED is fixed inside the front end of the main body; and a convex lens, the convex lens is arranged in front of the LED, and the convex lens can move relative to the LED. The distance between the LED and the convex lens changes within twice the focal length of the convex lens.

c.  Claim 1 of the Japanese Patent: (Ex. I)

A main body in which a power supply is mounted; An LED connected to the power supply and fixed inside the tip of the main body; A focus variable device for an LED, comprising: a convex lens that is provided in front of the LED, moves relative to the LED, and has a distance change within twice the focal length.

d.  Claim 1 of the German Patent: (Ex. J)

LED lighting device capable of quickly adjusting the focal length, comprising: a main body ( 1 ), inside which a power device is provided; an LED ( 21 ), which is electrically connected to the power device and inside the front part of the main body ( 1 ) is attached; and a convex lens ( 5 ), in front of the LED ( 21 ) and relative to the LED ( 21 ), wherein the relative to the convex lens ( 5 ) distance change of the LED ( 21 ) within twice the focal length of the convex lens ( 5 ) lies.

25.   The sole independent claim in each of the four foreign patents is also

identical with the sole independent claim in the application for Patent-in-suit

submitted to the USPTO in 2006: (Ex. F)

1. A light-emitting diode (LED) lighting apparatus, comprising: a housing,  having a power source; a light-emitting diode, electrically connected with the power source and positioned at front end of the housing; and a convex lens, moved back and forth with respect to the light-emitting diode and distance between the LED and the convex within two times of focal length of convex lens.

**The Chinese Invalidation Decision**

26.    Shortly after the Chinese Patent was granted, two Chinese companies challenged the validity of the Chinese Patent. Upon their request, the Chinese Patent Reexamination Board reviewed the Chinese Patent and issued a ruling ("Chinese Invalidation Ruling") on June 2, 2010 invalidating the Chinese Patent, merely one year after the Chinese Patent was granted.

27.    The Chinese Invalidation Ruling relied heavily on U.S. patent 6,866,401 B2, which was granted on March 15, 2005 ("U.S. Patent 2005"), and its patent application publication US 2003/0117797 A1. Annexed as Exhibit K is a true and correct copy of U.S. Patent 2005 and its earlier publication in 2003. The Chinese Invalidating Ruling held, and the Ouyangs agreed during the hearing, that the Chinese Patent is essentially the same as U.S. Patent 2005:

- the LED in U.S. Patent 2005 matches the LED in Claim 1 of the China Patent;

- the first sleeve 42 in U.S. Patent 2005 matches the body in Claim 1 of the China Patent;

- in U.S. Patent 2005, a plurality of lenses 38, which are Fresnel lens, are arranged in correspondence with the LED's, with each LED lying on the optical axis of an associated lens 38, it will be appreciated that zoom apparatus of the lamp effectuates bean width adjustment through relative

motion of the sleeves; because Fresnel lens have the same functionality as convex lens as to convergence of light, the lenses 38 in U.S. Patent 2005 matches the convex lens in Claim 1 of the China Patent;

- The associated battery or other electrical power Supply matches the power supply in Claim 1 of the China Patent;

- In U.S. Patent 2005, LED is fixed at the front end of inner sleeve 42, which is same as that in Claim 1 of the China Patent;

- In U.S. Patent 2005, electrical components such as a printed circuit board that electrically connects the LED's and has optional driving electronics operatively arranged thereupon an associated battery or other electrical power supply, is the same as that in Claim 1 of the China Patent.

28.    The Chinese Invalidating Ruling held, and the Ouyangs agreed during the hearing, that the only difference is that the Chinese Patent limited the distance between the LED and the convex lens to be in the range of zero to twice the focal length of the convex lens, but the U.S. Patent 2005 left this distance undefined so that that range was included within that prior U.S. Patent 2005.

29.    The Chinese Invalidation Ruling held that it is a common knowledge in the field that the change in object distance between the convex lens and the light source changes the convergence of the beam, i.e., when the distance between the

two is in the range of 0 to 1 times the focal length, an enlarged orthogonal virtual

image is obtained, and at this moment, as the distance between the convex lens and

the light source increases, the width of the beam emitted by the light source

through the convex lens becomes narrower, and when the distance between the two

is in the range of 1 to 2 times the focal length, an enlarged inverted real image is

obtained, i.e. in other words, when the object distance between the light source and

the convex lens is varied from 0 to 2 times the focal length, the convex lens always

converges the beam from the light source and forms a different state of the emitted

light, which is common knowledge in the field. For a lighting device, depending on

whether to be used in industrial production or in everyday life, according to the

actual application of different occasions, the state of the light requirement is

different, such as the need to irradiate a large range, the light source will generally

be placed within 1 times the focal length of the convex lens, so that the light

emitted by the light source through the convex lens of the convergence of the

floodlight lighting state, will meet the needs of a large area of lighting, of course, at

this time the light level is not high, and when the need for a high degree of

concentration of light Lighting, it is clear that the light source should be set in 1-2

times the focal length, based on this, in contrast to U.S. Patent 2005 has given the

use of convex lens and light source to adjust the spacing between the beam width of

the technical solutions, considering a greater degree of regulation of the beam, the skilled person in the field is motivated to use the above common knowledge of this range of 0 to 2 times the focal length of the object distance adjustment range applied to the Comparison Document 1 disclosed technical solution, so as to obtain the technical solution claimed to be protected by Claim 1 of the China patent, in order to achieve the technical effect of meeting different lighting requirements, the above combination does not require any creative labor, and at the same time the technical effect obtained is the same as the technical effect that can be obtained by the technical solution claimed to be protected by this patent, all of which is to adjust the light emitted from the light source so that the same light-emitting device can be The light emitted from the light source is adjusted so that the same light-emitting device can be adjusted to irradiate objects at close distances and objects at long distances, thus, Claim 1 of the China Patent is not inventive compared with the U.S. Patent 2005.

30.    The Ouyangs appealed the Chinese Invalidation Ruling to court. The Beijing First Intermediate People's Court upheld the Chinese Invalidation Ruling on December 20, 2010.

31.    The Ouyangs appealed further. On October 17, 2011, the High People's Court of Beijing Municipality upheld ("Beijing High Court Decision")

the Beijing First Intermediate People's Court's decision, and the Beijing High Court Decision is the final decision in this administrative appeal process. Annexed as Exhibit L is a true and correct copy of the judicial opinion issued by the Beijing High Court in both English and Chinese.

32.     While fighting the Chinese Invalidation Decision in courts in Beijing, the Ouyangs had also attempted to enforce their patent in China. They had filed lawsuits against retailers and manufacturers in Beijing and other parts of China for patent infringement. In these cases, the Chinese courts invariably relied on the Beijing High Court Decision and dismissed the Ouyangs' suits as baseless, because the Chinese Patent underlying all of their claims had been invalidated by the Beijing High People's Court.

### The Lawsuit Against Hweilung and On Light in Taiwan

33.     Similarly, the Ouyangs wasted no time in enforcing the Taiwanese Patent. Less than three weeks after the Taiwanese Patent was granted, the Ouyangs bought a flashlight in a shopping mall in Taipei, Taiwan and immediately thereafter brought a lawsuit against the shopping mall Test Rite Retail Co., Ltd, as well as the manufacturer Hweilung Company and the distributor On Light Company, for infringing the Taiwanese Patent.

34.     On May 31, 2010 in response to that action, the Taiwan Intellectual Property Court ruled that the Taiwanese Patent was invalid for lack of non-obviousness, because all the limitations contained in the seven (7) claims of the Taiwanese Patent were covered by a combination of two U.S patents: a patent titled "Flash Light" with a patent number 1,478,282 ("U.S. Patent 1923"), granted on December 18, 1923, and another patent titled "FLASHLIGHT" with a patent number US 7,147,343 B2 ("U.S. Patent 2006"), first published by the USPTO on September 30, 2004 and granted on December 12, 2006. Annexed as Exhibit M is a true and correct copy of U.S. Patent 1923. Annexed as Exhibit N is a true and correct copy of U.S. Patent 2006.

35.     U.S. Patent 1923 and U.S. Patent 2006 were introduced by Hweilung Company and On Light Company as evidence of prior art to invalidate the Taiwanese Patent.

36.     The Taiwan Intellectual Property Court held that although the US Patent 2006 was granted after the application date of the Taiwanese Patent, its publication date by the USPTO in 2004 was prior to the filing of the Taiwanese Patent, and therefore, is admissible as competent evidence.

37.     The Taiwan Intellectual Property Court held that a combination of the prior art references of U.S. Patent 1923 and U.S. Patent 2006 disclose all the limitations of Claim 1 of the Taiwanese Patent as follows:

- The LED 50 in U.S. Patent 2006 corresponds to the LED in the Taiwanese Patent;

- The front housing section 16 in U.S. Patent 2006 corresponds to the sliding sleeve in the Taiwanese Patent;

- The rear housing section 20 in the U.S. Patent 2006 corresponds to the main body in the Taiwanese Patent;

- The battery 90 in the U.S. Patent 2006 corresponds to the power supply inside the main body in the Taiwanese Patent;

- In both the U.S. Patent and the Taiwanese Patents, the LED's are fixated in the front of the rear housing section 20 / main body;

- In the U.S. Patent, the front housing section 16 can slide on the rear housing section 20, just as in the Taiwanese Patent, the sliding sleeve can slide on the main body;

- The lens in the U.S. Patent corresponds to the convex lens in the Taiwanese Patent;

- The lens in the U.S. Patent is set up on the front housing section, and the convex lens in the Taiwanese is set up on the sliding sleeve.

- In both U.S. Patent and Taiwanese Patent, the distance between lens and LED is adjustable.

- the only difference between the U.S. Patent 2006 and the Taiwanese Patent is that the U.S. Patent 2006 did not include the distance between the lens and the LED in the range of zero to one time focal length.

38.     Similarly, the Taiwan Intellectual Property Court held that all the limitations of Claim 1 of the Taiwanese Patent are disclosed by the U.S. Patent 1923, with only two differences:

- The light source in the U.S. Patent 1923 is a light bulb, whereas the light source in the Taiwanese Patent is LED;

- The U.S. Patent 1923 left the distance between the light source and the lens undefined, whereas the Taiwanese Patent defines a "first range" and a "second range".

39.     During a hearing March 29, 2010 before the Taiwan Intellectual Property Court, the Ouyangs acknowledged that the difference between their Taiwanese Patent and U.S. Patent 1923 is that U.S. Patent 1923 mainly operates

between zero and one time focal length, whereas their Taiwanese Patent added the distance between one time to two times the focal length.

40.     The Taiwanese Intellectual Property Court held that according to the principles of optical imaging, convergence of lighting beam requires a distance of one focal length and two focal lengths, whereas divergence of lighting beam requires 0 and one focal length. The boundary of such distances should be very familiar principles and common knowledge for people who are in the field of optics. Therefore, the Taiwanese Intellectual Property Court held that for a person skilled in the art, a combination of U.S. Patent 2006 and U.S. Patent 1923 did not produce unexpected effects, and therefore, the Taiwanese Patent could have easily been done by an ordinarily skilled person in the art based on prior art references U.S. Patent 2006 and U.S. Patent 1932.

41.     The Ouyangs appealed. On June 9, 2021, the appellate division of the Taiwan Intellectual Property Court upheld the lower court's decision. The appellate division stated in its opinion that the US Patent 1923 and the US Patent 2006 are both in the same field of flashlight technology, and a person who has common general knowledge in the art will have apparent motivation to combine the prior art of U.S. Patent 1923 and U.S. Patent 2006. And therefore, Claim 1 of the Taiwanese Patent could have been easily made by a person skilled in the art. Thus,

the combination of U.S. Patent 1923 and U.S. Patent 2006 is sufficient to establish

the lack of inventive step, or lack of non-obviousness, that's required for a valid

patent.

42.     After losing the appeal at the Taiwan Intellectual Property Court, the

Ouyangs appealed to the Supreme Court of Taiwan, which, on March 21, 2012,

dismissed their appeal for failure to state a claim for which the Supreme Court of

Taiwan can grant relief.

43.     Then the Ouyangs moved for reconsideration before the Taiwan

Intellectual Property Court, which on September 14, 2012, found the Ouyangs

motion meritless and dismissed their reconsideration motion.

44.     The Ouyangs appealed to the Supreme Court of Taiwan again. On

April 11, 2013, the Supreme Court of Taiwan ruled that the Ouyangs' appeal was

baseless.

45.     The Ouyangs then moved for reconsideration before the Taiwan

Intellectual Property Court again, and on July 9, 2013, the Taiwan Intellectual

Property Court dismissed the Ouyangs' motion for reconsideration again for failure

to state a ground for reconsideration.

46.     The Ouyangs appealed to the Supreme Court of Taiwan again and on December 25, 2013, the Supreme Court of Taiwan dismissed the appeal once again for failure to state a claim for which relief can be granted.

47.     The Ouyangs moved for reconsideration before the Taiwan Intellectual Property Court again, and on April 30, 2014, the Taiwan Intellectual Property Court found the Ouyangs' motion lacking in merit, and warned the Ouyangs that they should refrain from further frivolous litigation.

48.     The Ouyangs appealed to the Supreme Court of Taiwan again, and on February 5, 2015, the Supreme Court of Taiwan found that the Ouyangs' further appeal also lacked merit.

## The Lawsuit Against Wang Da Dian and PC Home Online

49.     In parallel with the lawsuit against Hweilung and On Light, the Ouyangs filed another patent infringement case before the Taiwan Intellectual Property Court. On December 8, 2009, the Ouyangs bought a flashlight sold by Wang Da Dian Company on the e-commerce platform PC Home Online, and soon after that, sued the seller Wang Da Dian Company and the e-commerce platform PC Home Online for infringing the Taiwanese Patent.

50.     On August 30, 2010, the Taiwan Intellectual Property Court ruled in favor of defendants Wang Da Dian Company and PC Home Online. While the

court made a reference to the Lawsuit Against Hweilung and On Light, it engaged in its own extensive analysis of the validity of the Taiwanese Patent, and reached the same conclusion–the Taiwanese Patent is invalid for lack of non-obviousness, because it could have been easily made by a person skilled in the art by combining U.S. Patent 1923 and U.S. Patent 2004.

51.    The Ouyangs appealed. On March 29, 2011, the appellate division of the Taiwan Intellectual Property Court upheld the lower court's decision.

## Taiwan Invalidation Decision

52.    On June 17, 2010, PC Home Online filed a request with the Taiwan Patent Office to invalidate the Taiwanese Patent.

53.    On December 23, 2010, during the invalidation review process of the Taiwanese Patent, the Ouyangs made an application to amend the Taiwanese Patent, and were granted approval for amending the Taiwanese Patent.

54.    On September 2, 2011, the Taiwan Patent Office ruled that the Taiwanese Patent, after considering the amendment, is invalid for obviousness ("Taiwan Invalidation Decision").

55.    The Ouyangs appealed through the administrative process. On August 20, 2012, the Ministry of Economic Affairs of the Taiwanese Government upheld the Taiwan Invalidation Decision.

56.     The Ouyangs then sued the Taiwan Patent Office in the Taiwan Intellectual Property Court to attempt to overturn the Taiwan Invalidation Decision. The Taiwan Patent Office defended the Taiwan Invalidation Decision by arguing that the Taiwanese Patent is invalid for lack of non-obviousness, because it could have been easily made by a person skilled in the art by combining U.S. Patent 1923 and U.S. Patent 2006. On July 11, 2013, the Taiwan Intellectual Property Court ruled in favor of the Taiwan Patent Office.

57.     The Ouyangs appealed to the Supreme Administrative Court of Taiwan, which on November 21, 2013 upheld the ruling of the Taiwan Intellectual Property Court and confirmed that the Taiwanese Patent is invalid for lack of nonobviousness, because it could have been easily made by a person skilled in the art by combining U.S. Patent 1923 and U.S. Patent 2006.

**The Japanese Invalidation Decision**

58.     On June 10, 2010, the auto maker Infinity submitted a Request for Registrability Report to the Japan Patent Office, and demanded a technology assessment of the Japan Patent.

59.     On November 29, 2011, the Commissioner of the Japan Patent Office issued a technical opinion ("Japanese Technical Opinion") on the Japanese Patent, ruling that the all the claims in the Japanese Patent lack the inventive step or non-

obviousness. Annexed as Exhibit O is a true and correct copy of the Japanese

Technical Opinion in both English and Japanese.

60.     In particular, for Claim 1, the Japanese Technical Opinion stated that

"it was very easy for a person ordinarily skilled in the art to conceive of placing the

range of the micro adjustment of the Focal Point Distance f within 2 multiples."

## The German Invalidation Decision

61.     On April 20, 2015, an IP right review request was filed with DPMA,

requesting cancellation of the German Patent.

62.     On September 30, 2016, the IP right on the German Patent expired.

63.     Upon information and belief, the Ouyangs appealed through DPMA's

administrative review process and on March 7, 2017, the DPMA affirmed the

cessation of IP right on the German Patent ("German Invalidation Decision").

64.     The Ouyangs then appealed the German Invalidation Decision to

court, and on May 16, 2017, their case was pending before the Federal Patent Court

of Germany ("BPatG").

65.     On November 27, 2018, all of the Ouyangs' appeals were rejected,

refused or otherwise settled in Germany. Annexed as Exhibit P is a true and correct

copy of the legal event ledger maintained by the European Patent Office for the

German Patent.

The Nonpayment of Maintenance Fees

66.     Prior to assigning the Patent-in-suit to Plaintiff in late 2022, the last time that the Ouyangs paid maintenance fees on the Patent-in-suit was in November 2016. At that time, while they had exhausted their administrative and legal remedies to overturn the Chinese Invalidation Decision and Taiwan Invalidation Decision, and had lost in both the lawsuit against Hweilung and On Light and the lawsuit against Wang Da Dian and PC Home Online, they were still fighting the German Invalidation Decision.

**67.**     The Ouyangs did not pay the 11.5-year patent maintenance fee due on November 13, 2020, and at that time, they had reached the end of all the legal and administrative remedies for their Chinese Patent, Taiwan Patent and German Patent and had already transferred their Japan Patent to someone else.

68.     The Patent-in-suit expired on May 12, 2021 due to nonpayment of the 11.5-year maintenance fee.

69.     On October 31, 2022, the Ouyangs entered into a Patent Acquisition Agreement and a Patent Assignment Agreement with Plaintiff, and there by assigned the Patent-in-suit to Plaintiff in its entirety. (Ex. C)

70.     On November 3, 2022, Plaintiff's attorney Michael Alexander

Hurckes, acting on behalf of Plaintiff, filed a Petition to Accept Unintentionally

Delayed Payment of Maintenance Fee In An Expired Patent.

71.     On November 15, 2022, this Petition was dismissed by the USPTO,

because it was "considered to not contain a proper statement of unintentional

delay."

72.     After the Plaintiff's resubmission of the Petition to Accept

Unintentionally Delayed Payment of Maintenance Fee In An Expired Patent

through a different patent practitioner in Texas, the USPTO granted the petition

on December 7, 2022, but noted the following:

"It is not apparent whether the person signing the statement of unintentional delay was in a position to have firsthand or direct knowledge of the facts and circumstances of the delay at issue. Nevertheless, such statement is being treated as having been made as the result of a reasonable inquiry into the facts and circumstances of such delay…. **In the event that such an inquiry has not been made, petitioner must make such an inquiry.** If such inquiry results in the discovery that it is not correct that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to 37 CFR 1.378 was unintentional, **petitioner must notify the Office**." **(Emphasis added.)**

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, NY on March 1, 2023.

Respectfully submitted,

/s/   *Beixiao Liu*
_____

Beixiao Robert Liu (Bar #: 5697552)

Balance Law Firm

1 World Trade Ctr Ste 8500
New York, NY 10007

(212) 741-8080

(646) 558-4889

robert.liu@balancelawfirm.com

Attorneys for Defendants Shenzhen Sen Zhi
Run Dian Zi Shang Wu Co., Ltd. and
Haikoushi Lvxuan Trading Co., Ltd.